UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
BRUCE BUTLER,

                                        Plaintiff,                    14-CV-2325 (SN)

                -against-                                             <u>OPINION AND ORDER</u>

CAROLYN COLVIN, ACTING
COMMISSIONER OF SOCIAL SECURITY,

                                        Defendant.
----------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __ 6/8/2015
```

**SARAH NETBURN, United States Magistrate Judge:**

Plaintiff Bruce Butler brings this action pursuant to Section 205(g) of the Social Security

Act (the "Act"), 42 U.S.C. § 405(g), and seeks judicial review of the final determination of the

Commissioner of Social Security (the "Commissioner") denying his application for Social

Security Disability Insurance benefits ("DIB" or "disability"). Both parties moved for judgement

on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

The Court finds that the administrative law judge ("ALJ") properly evaluated Butler's

credibility, did not have or fail in a duty to seek clarification of the record, and that his residual

functional capacity ("RFC") determination is supported by substantial evidence. The Court also

finds, on review, that the ALJ's decision was otherwise free of legal error and supported by

substantial evidence. Accordingly, the Commissioner's motion for judgment on the pleadings is

GRANTED, and Butler's motion is DENIED.

## PROCEDURAL BACKGROUND

On April 10, 2010, Butler filed an application for disability benefits, claiming a disability

that started on July 10, 2008 due to a back condition, a leg condition, and hypertension. His

application was initially denied and, following a hearing, ALJ Roberto Lebron issued a decision

denying Butler's claim. The Appeals Council denied Butler's request for review on January 16, 2014.

On April 3, 2014, Butler filed a complaint in this Court (ECF No. 1), which noted that he had requested an extension on March 5, 2014, for the time to file his appeal that had gone unanswered, and asked that his request be accepted.[1] Following the parties' consent to my jurisdiction (ECF No. 8), both parties moved for judgment on the pleadings.

## FACTUAL BACKGROUND

The following facts are taken from the administrative record.

## I.      Non-medical History

Bruce Butler was born on February 20, 1959. He worked as a technician at Verizon from May 14, 1979 until July 10, 2009, installing telephone lines and making repairs. According to notes from his physicians, he was involved in multiple accidents, including car accidents in 1995, 1997, 1998 and 2003, each of which caused injuries to his neck and back. In 2001, he slipped on a wet floor and re-injured his neck and lower back. And on July 10, 2008, Butler was injured in an accident at work that led to the current claim. Butler was in a cherry-picker bucket when a coworker drove the vehicle away causing injury to his lower back when Butler was pinned between the cable and the bucket.

## II.     Relevant Medical History

### A.      Treatment Before Claimed Disability

Butler saw Dr. Peter Schmaus, M.D., for a medical consultation on October 29, 2001, at the request of the Verizon's Worker's Compensation Group. He found only mild symptoms and ordered imagining tests. He examined Butler again on December 29, 2001, and found that Butler

---

[1] The Commissioner has not raised the timeliness of Butler's claim in her motion, and so the Court presumes that she has consented to Butler's request for an extension.

suffered from lumbar radiculopathy (a pinched nerve in the spinal nerve or back) and a myoligamentous (muscle and ligament) injury of the lumbar spine. In follow-up visits, Dr. Schmaus cleared Butler to return to full duty work at the end of February 2002.

Butler was also under the care of Dr. Howard Baruch, M.D., an orthopedist, for back pain. On December 23, 2002, Dr. Baruch had Butler get a magnetic resonance imaging ("MRI") of his lumbar spine, which revealed small herniations and minimal compressions. On March 23, 2004, Dr. Baruch examined Butler for his worker's compensation claim and diagnosed low back pain and right-sided radiculopathy, for which he recommended epidural injections. Butler's symptoms remained at a May 4, 2004 follow-up, and Dr. Baruch again prescribed epidural shots. On July 28, 2005, Dr. Baruch wrote that Butler had completed his treatment.

Dr. Arthur C. Rothman, M.D., Ph.D., gave Butler a neurological and neuropsychiatric evaluation on April 23, 2003. Dr. Rothman noted that Butler had seen a variety of other physicians following his September 8, 2001 slip-and-fall accident, for which he missed about eight months of work. Dr. Rothman examined Butler on complaints of persistent lower back pain, which radiated down both of his legs to his toes, and neck pain. He found that Butler was morbidly obese and suffered from cervical radiculopathy (a pinched nerve in his cervical spine or neck), lumbosacral radiculopathy, and Adjustment Disorder with Mixed Anxiety and Depressed Mood, 309.28.[2] Dr. Rothman concluded that Butler suffered a permanent 20-percent disability as a result of these impairments.

---

[2] The Diagnostic and Statistical Manual of Mental Disorders uses Adjustment Disorder With Mixed Anxiety and Depressed Mood, 309.28, to code for a disorder characterized by emotional or behavioral symptoms that develop within three months of the onset of identifiable stressors and are either in excess to what would normally be expected or that significantly impair social or occupational functioning, with the predominant manifestation being a combination of depression and anxiety. Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 624, 626 (4th ed. 1994) ("DSM–IV").

Dr. Arthur H. Tiger, M.D., examined Butler on April 2, 2003. A lumbar MRI showed a bulging disc at the L5-S1 level, but Butler had a normal cervical MRI. Dr. Tiger found that the 2001 accident gave Butler a residual case of mild cervical strain syndrome with chronic myofascitis (muscle inflammation), resulting in a partial 17.5-percent disability. He also noted residual chronic lumbosacral strain syndrome with chronic myofascitis, a bulging L5-S1 disc and signs of S1 radiculopathy, with an estimated partial disability of 25 percent. Two years later, Dr. Tiger noted increased symptoms in Butler's neck and back followed by therapy and epidurals, but concluded that Butler's neck was the same as in the April 2003 examination and maintained his estimate of Butler's cervical spine disability. When Butler reported increased back pain, Dr. Tiger raised his estimate of that disability to a partial 35 percent.

On April 20, 2004, Dr. Richard Pelosi of Bergen-Passaic Neurological Associates, LLC, wrote a letter describing his examination of Butler. Dr. Pelosi did not have all of Butler's records or tests, including any MRIs. Dr. Pelosi found that Butler suffered from: (1) degenerative disc disease and spondylosis (age-related wear and tear on the spinal discs) at L4-S5 and L5-S1, with suspected unstable spine syndrome; (2) a herniated disc at L4-S5 with right L5 radiculopathy; (3) post-traumatic chronic lumbar fibromyositis (chronic muscle inflammation); and (4) mild superimposed anxiety with conversion features.

### B.     Post-Disability Medical Records

#### 1.     Hudson Valley Radiology Associates

On August 27, 2008, Butler underwent an MRI of his lumbar spine with Dr. Joel Schwarz, M.D., of Hudson Valley Radiology Associates ("HVRA").[3] Dr. Schwartz found that

---

[3] Dr. Schwartz also took an MRI of Butler's left shoulder on January 15, 2007, before the claimed disability.

Butler suffered from severe degenerative disc disease at the L4-5 level with mild canal stenosis[4] and small left paracentral disc herniation at L5-S1 with mild compression of the left S1 nerve root.

Dr. Kenneth Blumberg, also of HVRA, took an MRI of Butler's right knee. He concluded that Butler had (1) a small fluid collection anterior to the patella (knee joint), which was due to either pre-patellar bursitis (inflammation of a fluid sack) or small organized hematoma (bleeding); (2) moderate chondromalacia patellae (damage to the cartilage under the kneecap); (3) evidence of edema (swelling) tracking along the medial patellar retinaculum, which was compatible with a sprain; (4) no meniscal or ligament tear; and (5) a small abnormal signal in the medial femoral condyle (femur) cartilage, which was compatible with mild chondromalacia (inflammation).

On July 16, 2011, Dr. Schwartz took another MRI of Butler's lumbar spine. He found that Butler still had early facet (joint) arthritis, disc degeneration, moderate canal stenosis and mild eccentric left-sided encroachment (spinal degeneration).

### 2.     Bergen Regional Medical Center

Butler saw Dr. Danielle Groves, a pain specialist at Bergen Regional Medical Center ("BRMC"), for a series of three caudal epidural steroid injections between November 2008 and April 2009 because of his lumbar radiculitis. BRMC's records contain no other clinical information or findings.

---

[4] Stenosis refers to a "narrowing of the spinal column that causes pressure on the spinal cord, or narrowing of the openings (called neural foramina) where spinal nerves leave the spinal column." *Spinal Stenosis*, MEDLINE PLUS, http://www.nlm.nih.gov/medlineplus/ency/article/000441.htm (last visited April 29, 2015).

### 3.       Hudson Heart Associates

Butler visited Hudson Heart Associates ("HHA") regarding his hypertension and chest pain. He primarily saw Dr. Ainat Beniaminovitz. A note from July 23, 2009 is largely illegible but says that Butler had not yet started using a nitropatch, a type of nitrate patch used for chest pain. On October 23, 2009, Dr. Beniaminovitz examined Butler and found atypical signs of angina,[5] but that he had a normal electrocardiogram and that tests had failed to confirm ischemia (a restriction in blood supply). Other notes in the record, from this same date and also signed by Dr. Beniaminovitz, indicate that Butler performed well on a stress test and EKG, even though he had some atypical angina symptoms. A handwritten note, which is largely illegible, says that Butler thought the nitrate patches he was first prescribed in 2001 were helping his chest pain.

An ECG report by Dr. Richard Roth at HHA on August 19, 2009 concluded that Butler had: (1) a moderately dilated left ventricle; (2) a normal wall thickness in his left ventricular wall; (3) hyperdynamic left ventricular systolic function, with an ejection fraction (the fraction of blood pumped out of the heart in a beat) estimated at greater than 70 percent; and (4) a moderately dilated left atrium.

### 4.       Bergen Pain Associates

Butler saw doctors at Bergen Pain Associates ("BPA" or "Bergen") between 2008 and 2011. On October 15, 2008, Butler signed a "Pain Management Agreement" agreeing to the terms of his prescription for oxycodone, a narcotic, opioid pain medication. Notes from May 2009 indicate that BPA encouraged Butler to maintain his drug regimen, which included oxycodone. Butler's pain was described as stable in notes on February 21, 2009, May 16, 2009, August 25, 2009 and October 22, 2009.

---

[5] "Angina is chest pain or discomfort you feel when there is not enough blood flow to your heart muscle." *Angina*, MEDLINE PLUS, http://www.nlm.nih.gov/medlineplus/angina.html (last visited April 29, 2015).

On October 9, 2009, Butler wrote a letter to BPA asking to change his appointment "[d]ue to summer work hours and family obligations." R. at 595. He indicated he was working in both New York and New Jersey, was planning to retire soon, had an upcoming job interview in Washington, D.C., and was sharing the care of his wheelchair-bound mother with his siblings. He included his train ticket as proof. On October 22, 2009, Butler wrote a letter to BPA again asking to move his appointment, this time saying that he and his wife were planning a three-week trip to Europe to attend his sister-in-law's wedding and enclosing tickets as proof.

A series of letters from Medco asked about Butler's potential abuse of oxycodone, which BPA repeatedly indicated was not suspected. In June 2009, however, Medco wrote a letter to BPA indicating that it believed Butler's use of oxycodone reflected "a pattern of medication use that may be excessive." R. at 598. Meanwhile, tests from Clinical Science Laboratory indicated the presence of opiates in Butler's system on January 5, 2008 and May 21, 2009.

Notes from May 18, 2010 indicate that Butler had reported no relief since his medications were reduced, and that pain woke him up every night. Several other BPA notes are illegible, though a note from December 21, 2010 indicates that Butler is to continue his regimen. An evaluation form from April 13, 2010 indicates that BPA was tapering Butler's oxycodone use.

Mixed within the BPA records is a February 28, 2011 hospital form from Bon Secours Health System, Inc. indicating that Butler was diagnosed with opiate withdrawal, chest pain and hypertension. He underwent multiple tests and was discharged.

### 5.   Dr. Seymour Sprayregen

On July 19, 2010, Butler underwent a lumbosacral spine x-ray with Dr. Seymour Sprayregen of IMA Disability Services. The x-ray showed that Butler had no fracture or

subluxation (dislocation), though he did have disc thinning at L4-L5 and suggestions of facet arthropathy, or joint inflammation. Butler's sacroiliac (pelvic) joint appeared normal.

### 6.     Workers' Compensation Report of Dr. Vijaykumar Kulkarni

On March 8, 2011, Butler saw Dr. Vijaykumar Kulkarni of SalMyers Associates for an evaluation of his impairment in connection with his workers' compensation claim. Dr. Kulkarni reviewed Butler's medical records and treatment and wrote that Butler reported that he had been out of work for nine months. Butler complained of left shoulder pain and stiffness that radiated into his neck and increased with changes in the weather, as well as a loss of strength. He reported lower back pain and stiffness that was increased with movement, pain radiating down both legs and worse on the right, and right knee pain and stiffness.

Dr. Kulkarni diagnosed Butler with sprain and strain of the: (1) left shoulder, with residuals of post-traumatic synovitis (joint inflammation) and loss of range of motion; (2) lumbar spine, aggravating pre-existing disc protrusion at the L5-S1, impinging on the left S1 nerve root, and a disc bulge at L4-S5 with residuals of post-traumatic fibromyositis with loss of range of motion; and (3) right knee, with residuals of post-traumatic synovitis with loss of range of motion. He evaluated Butler with permanent, partial 25-percent orthopedic disabilities in his total left shoulder, total lower back, and his right leg. He wrote that the July 10, 2008 accident appeared to be the proximate cause of Butler's disabilities in his left shoulder and right knee, and that the accident exacerbated pre-existing injuries in his lower back.

### 7.     Dr. Suman Sawhney

Butler began seeing Dr. Suman Sawhney for hypertension and back pain on March 11, 2011. The vast majority of Dr. Sawhney's handwritten notes are illegible, but he wrote several

letters to Dr. Jerry Lin, another of Butler's doctors, summarizing his care for Butler.[6] He also provided Butler with a Cardiac Medical Source Statement.

In April 2011, Dr. Sawhney received a letter from Medco indicating that Butler appeared to be misusing opioid/narcotic analgesics. The letter is similar to the one sent to Dr. Ronald Spinapolice of BPA. On May 2, 2011, Butler signed a release to allow Dr. Sawhney to speak with doctors at the Yeager Health Center Methadone Treatment Program. In this section of the records, there are also x-ray notes, dated April 11, 2011, from JFK Medical Center, apparently in West Palm Beach, Florida. The x-rays showed only a two-centimeter calcified structure that was recommended for further evaluation, and mild degenerative changes in his thoracic spine.

On June 2, 2011, Dr. Sawhney wrote a letter to Dr. Lin. Dr. Sawhney indicated concern with Butler's use of prescription pain medication. "He has been on narcotic medication (oxycodone) by various doctors in the past [approximately] 20 years, where he has been using large doses for [the] past several years." R. at 557. Dr. Sawhney wrote that Butler was taking more oxycodone than prescribed or directed, and had twice tried but failed narcotic detoxification ("detox") or rehabilitation programs. Dr. Sawhney wrote that he "strongly recommend[ed a] methadone treatment program for him" because Butler was "physically and psychologically dependent on narcotic[s]/oxycodone" and experienced elevated blood pressure, a symptom of withdrawal, when he attempted to reduce his oxycodone usage. Id.

On June 17, 2011, Dr. Sawhney wrote another letter to Dr. Lin indicating that Dr. Sawhney saw Butler after he was rejected by Yeager. Dr. Sawhney gave Butler a prescription to cover him until he saw Dr. Lin, but had not given him any prescriptions after that. An undated note in the record appears to also follow Butler's visit to Yeager. Dr. Sawhney wrote that Butler

---

[6] Dr. Lin's own notes are described below.

was "honest" and "a man of strong will." R. at 454. Dr. Sawhney wrote that Butler initially met Yeager's guidelines for admission but was ultimately not accepted. Butler was appealing the decision and was also attempting to wean himself off of his medication, and Dr. Sawhney said he would follow Butler and was "confident he [would] be successful." Id.

On March 22, 2012, Dr. Sawhney filled out a Cardiac Medical Source Statement for Butler. Dr. Sawhney diagnosed Butler with hypertension causing chest pain, based on a 2009 nuclear stress test, apparently the one Butler received at HHA, and also indicated that Butler suffered from angina. The angina caused Butler to experience chest pain after walking two blocks and until he rested and meant he would need to rest two to three times a week for 30 minutes to relieve his chest pain. Dr. Sawhney wrote that emotional stress brought on chest pain for Butler, but that he was capable of low-stress work, and that his symptoms were causing anxiety and depression that contributed to his functional limitations that were expected to last at least twelve months.

Regarding Butler's functional limitations, he found that Butler was capable of walking one block, and of sitting, standing and walking less than two hours in an eight-hour workday. Dr. Sawhney said Butler needed a job that allowed him to shift positions at will; take unscheduled breaks during the work day once or twice a week; and to rest once or twice a week by sitting down quietly, lying down, or both. Butler was listed as rarely capable of lifting and carrying 10 to 20 pounds, and never able to lift 50 pounds; rarely able to twist and stop; barely able to crouch and squat; and never able to climb stairs or ladders. Dr. Sawhney listed Butler's environmental restrictions as avoiding even moderate exposure to extreme cold, extreme heat, high humidity, wetness, perfumes, and chemicals, and to avoid all exposure to cigarette smoke, fumes, odors, gases, and dust. Dr. Sawhney listed both that Butler should avoid even moderate exposure to

soldering fluxes (chemical cleaning agents) and that he had no restrictions regarding them. Dr.
Sawhney also estimated that, at work, Butler was likely to be "off task" at least 25 percent of the
time; that his condition was likely to produce "good days" and "bad days"; that he was likely to
miss more than four days per month; and that his symptoms were reasonably consistent with
these estimated functional limitations. Dr. Sawhney found that Butler's other limitations were
obesity, hypertension, and back pain, and that these "interfere with his activities of daily living."
R. at 642.

### 8. The Treatment Center of the Palm Beaches

On March 28, 2011, Butler went to The Treatment Center of the Palm Beaches (the
"Treatment Center" or the "Center") in West Palm Beach, Florida, to be assessed for an inpatient
drug rehabilitation program. At his initial assessment, his blood pressure was 160/110, his pulse
was 99, and he was experiencing multiple symptoms of withdrawal: nausea, anxiety, abdominal
cramps, sweats, unsteady gait, irritability, chills, muscle cramps, hypertension, and restlessness.
He was also experiencing constipation, diarrhea, cough, chest pain, hemoptysis (the coughing up
of blood), gastrointestinal reflux, vomiting, and hives. He reported experiencing insomnia, and
that the longest time he had been "clean" of drugs was three weeks between 10 and 15 years in
the past.

Regarding his history of chemical dependence, Butler reported that he had last used
methadone daily about 10 years ago. He used oxycodone since his twenties, the last time being
that same day, and normally took between 800 and 900 mg per day. He had been taking Xanax, a
tranquilizer, occasionally until 6 months ago. Butler's pain assessment indicated that he reported
experiencing chronic pain, unrelated to withdrawal, for more than six months. He was listed as
demonstrating signs of pain, and he reported experiencing aching, burning, pressing, and

stabbing pains that started 20 years ago, were omnipresent, were helped by oxycodone, and which caused insomnia three times a week. His mood was listed as "dreadful" and the report mentioned that he felt guilt about the effect of his problems on his children. On the risk assessment, Butler was categorized as "low risk," with no immediate action needed. A nursing assessment from The Treatment Center, also dated March 28, 2011, summarized Butler's history and stated that he was "being admitted to The Treatment Center for oxycodone abuse." R. at. 625.

The next document in this part of the record is a psychiatric admission evaluation, dated April 10, 2011, and signed by Dr. Theodore R. Treese, M.D. Butler's chief complaint was listed as a self-reported allergy to Suboxone, a medication used to treat opioid addiction. Dr. Treese noted that Butler was previously admitted to the Center from March 31, 2011 to April 8, 2011, and wrote that Butler said he was a retired lawyer, former physician's assistant, and that he was "threatening" when insisting on particular medications. R. at 630. Under medical history, Dr. Treese described Butler's lumbar radiculopathy, high blood pressure, and morbid obesity, as well as degenerative joint disease. He noted that Butler had previously sought treatment from a pain specialist who encouraged him to go 30 days without oxycodone. Butler was listed as having a possible seizure at the age of 14, one loss of consciousness from a motor vehicle accident in the "remote past," no history of trauma or abuse, a "[b]rother and father with alcohol and chemical dependence," and no suicidal or homicidal ideations. R. at 631.

Under mental status, Dr. Treese said Butler appeared disheveled and morbidly obese; spoke loudly, inappropriately, and with excessive profanity; threatened legal action against the Center for not giving him hydrocodone, another narcotic opioid pain medication; was guarded, resistant, hostile, and uncooperative; had a mood that was anxious, irritable, dysphoric, angry,

subdued, ashamed, and guilty; and had a labile affect, but not aggressive or destructive thoughts or behaviors, mania, or psychosis. Under "vegetative signs," Dr. Treese wrote that Butler was experiencing dysphoria (dissatisfaction), crying spells, anhedonia (inability to experience pleasure), hopelessness, helplessness, anergia (lack of energy), decreased appetite, preoccupation, decreased sleep, and decreased concentration. He also noted that Butler had below-average impulse control, introspection and judgment, and found that he faced "[s]evere limit[s] in introspection, somatization, limited coping, [and] threatening litigation/ambivalence about treatment." R. at 634. Dr. Treese diagnosed Butler with opioid dependence and anxiety disorder, not otherwise specified.[7] He evaluated Butler's Global Assessment of Functioning, or GAF, at 35, and no higher than 40 in the past year.[8]

Under justifications for detoxification, Dr. Treese wrote that Butler had an "acute history" of both "psychoactive substance abuse" and an "inability to maintain any type of long-term absence [*sic*] from psychoactive substances." R. at 635. He recommended Butler go through intensive in-patient, residential detoxification, and receive: medication management; health and physical evaluations; 24-hour monitoring; individual, group and family psychotherapy; psychoeducational group therapy; and case management. He also noted that Butler had "contradicted his history of Suboxone allergy and use," and that Butler's past use of Suboxone

---

[7] Anxiety Disorder, Not Otherwise Specified, 300.00, is used in the DSM–IV to code for a disorder characterized by "prominent anxiety or phobic avoidance" but that do not meet the criteria of other disorders. DSM–IV 444.

[8] "[Global Assessment of Functioning] rates overall psychological functioning on a scale of 0–100 that takes into account psychological, social, and occupational functioning." Zabala v. Astrue, 595 F.3d 402, 405 n.1 (2d Cir. 2010) (citing DSM–IV 34 (4th ed. rev. 2000)). A GAF between 31 and 40 indicates "[s]ome impairment in reality testing or communication (e.g. speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." DSM–IV 32. The Fifth Edition of the DSM has discarded the use of GAF Scores. See Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013) ("DSM–V"). The DSM–IV, however, was in effect at the time of Butler's evaluation.

had likely led to sudden withdrawal. R. at 636. He prescribed Butler with Suboxone for expected

mild symptoms of withdrawal, and noted that Butler refused non-narcotic insomnia treatment.

Finally, the Center's records include a discharge plan signed by numerous individuals,

but not Butler, on April 10, 2011.

### 9.    Dr. Jerry Lin

Butler began seeing Dr. Jerry Lin on April 18, 2011. Dr. Lin's handwritten notes from the

initial consultation, which are only partially legible, say that Butler was morbidly obese; had a

full range of motion of his lumbar area, without instability or muscle atrophy; and had healthy

right and left lower extremities, though with some weakness. Butler listed his hobbies as diving

and flying. Dr. Lin diagnosed Butler's primary problem as chronic right lower extremity

radiculopathy and weakness. He prescribed Butler with oxycodone and indicated that his

prognosis was one of good pain management. Butler also signed an agreement regarding "Long

Term Controlled Substances Therapy," similar to the agreement he signed with BPA, though this

document indicated that he would get all of his controlled substances through Dr. Lin and from

Schultz Pharmacy.

Following the visit, Dr. Lin wrote a letter to Dr. Adrienne Miller, M.D., thanking her for

referring Butler to him. Dr. Lin wrote that Butler had left his pain management doctor from New

Jersey, presumably BPA, because he was unhappy with his treatment there, and sought out Dr.

Miller in Florida. Dr. Lin summarized Butler's symptoms as chronic lower back pain that

radiated to the back of his right calf, as well as right lower extremity weakness. He said Butler

was suffering from right chronic lumbosacral radiculopathy with weakness, but was reporting

good relief on 50 mg of oxycodone every four to six hours, taking an average of six pills per day.

Dr. Lin said the plan for Butler was to have Dr. Lin be the sole provider of pain medication, to continue taking 50 mg oxycodone as needed, and to return in three weeks.

On April 25, 2011, Butler visited Dr. Lin for a follow-up appointment. Dr. Lin wrote that Butler "report[ed] that he is working again and eventually had to double up on medication . . . for a few hours." R. at 540. He doubled Butler's prescription of oxycodone and also noted that Butler was attending his son's graduation on May 9, 2011.

An undated document in this part of the record, entitled "Work Assignment Pain Levels," appears to reflect Butler's self-reported experiences of pain throughout a work week. This is supported by its location in the record between the notes from April 18, 2011 and April 25, 2011, and Dr. Lin's reference to Butler's return to work. The document describes waking up due to pain, and Butler doing work such as pushing cable reels, pulling cables up several floors, climbing ladders, and climbing poles with spiked climbing books. A handwritten note on the document says, "Keep in chart – Do not give out!" R. at 539.

On April 29, 2011, Butler returned to Dr. Lin with continuing complaints of pain and difficulty sleeping. Butler told Dr. Lin that he had to take oxycodone every four hours or he would break out in sweats, and Dr. Lin noted that Butler had previously been taking only 30 mg of oxycodone, not 50 mg; Dr. Lin prescribed Butler the lower dose but noted that his condition had not changed. On May 2, 2011, Butler signed a release allowing Dr. Lin to speak with Dr. Antwane Phillips of the Yeager Health Center Methadone Program.

On May 5, 2011, Dr. Lin wrote that Butler was leaving for Alabama that day. Butler reported that the medication had helped with his pain, though he continued to wake up at night and needed to take pills in order to fall back asleep. Dr. Lin also noted that Butler was continuing

to experience pain during all activities, "especially at work." R. at 547. Butler saw Dr. Lin again on May 16, 2011, with no new complaints.

On May 23, 2011, Butler visited Dr. Lin. The notes are largely illegible, but Dr. Lin wrote that Butler was "[g]oing to London" for between two and three weeks, and had tenderness and only 80 percent of his full range of motion in his left upper extremity ("LUE"). R. at 552. The record includes a flight confirmation from US Airways for a flight from Newark, N.J. to Heathrow Airport in London on May 23, 2011.

Dr. Sawhney's June 2, 2011 letter recommending that Butler enter a methadone treatment program appears in Dr. Lin's notes. On June 3, 2011, Dr. Lin gave Butler a prescription for oxycodone 30 mg. He wrote a note to the pharmacist saying that Butler was "taking more pills" and "[w]ill begin methadone program." R. at 556. On June 5, 2011, Dr. Lin noted that Butler was still experiencing pain. He said Butler was "taking about 10 pills per day." R. at 554. He continued to experience tenderness in his LUE, which was accompanied by the handwritten note "+ Jobs." Id. His LUE range of motion was 70 percent. Under "prognosis," Dr. Lin noted that Butler was in a methadone program for about six months, to which would take about 10 days to be admitted. Butler does not appear to have completed the program.

On June 9, 2011, Dr. Lin said that Butler had been in Alabama and then London for a few weeks "for work." R. at 559. Butler said he continued to experience pain that was "tolerable" with medication but rated a 10 out of 10 without medication. Dr. Lin wrote that Butler had been unable to get into the Yeager program, had 80 percent range of motion in his LUE and continued to experience job-related tenderness. He continued Butler's prescription for oxycodone 30 mg and recommended an epidural in eight weeks. On June 20, 2011, he wrote on Butler's prescription for oxycodone 30 mg that the pills were for "chronic intractable pain." R. at 491.

On July 8, 2011, Butler brought an old prescription to Dr. Lin and reported that his brother-in-law had been killed in a car accident. Dr. Lin wrote Butler a prescription for a month of oxycodone pills and a note indicating that he was under Dr. Lin's care. An update written on July 12, 2011, said that Butler had cancelled his appointment at Midrock, along with the phone number for Mid Rockland Imagining, a location of HVRA.

On July 11, 2011, Butler had full range of motion, reported nothing regarding his right or left upper extremities, and reported doing well in his right and left lower extremities. Dr. Lin continued his prescription. On July 25, 2011, Butler told Dr. Lin that his pain had increased by 20 percent, and that he was in constant pain that was exacerbated by movement. Butler was supposed to have received an epidural shot, but did not due to illness.

On August 8, 2011, Butler reported that his pain was a 10 out of 10, was worse than before, and was exacerbated by any movement. He was also experiencing numbness and tingling. Butler did not get an epidural because he was on antibiotics and was dealing with issues from taking his mother to a nursing home. Dr. Lin continued his prescription of oxycodone. On August 19, 2011, Butler still had not received the epidural due to his antibiotics, and was still experiencing increased pain, numbness, and tingling.

On September 2, 2011, Butler was still experiencing increasingly sharp pains. An apparent update written by hand indicates that Butler visited Ukraine with his wife on September 18, 2011, bribed a Ukrainian customs official to bring his oxycodone into the country, and left pills at his mother-in-law's house that he intended to retrieve later.

On September 8, 2011, Butler reported that his pain had increased by 80 percent and that he was experiencing constant pain that was exacerbated by movement. Butler was taking up to 12 oxycodone pills per day and got an early refill prescription due to a holiday weekend. Dr. Lin

continued to recommend an epidural, of which Butler had had about 11 in the past 10 years, but he also noted that Butler had had one bad reaction, which led to a week-long hospitalization.

Dr. Lin's notes from September 12, 2011, say that Butler was planning to fly to Florida on September 15, 2011, and spend approximately two weeks there with his wife before going on a cruise to the Bahamas. Butler was still experiencing chronic severe pain. An undated, handwritten note, apparently from Butler, says that he hoped to see Dr. Lin on September 15, before his trip to Florida, to get a prescription that would last him four weeks. He said he would send his plane ticket to Dr. Lin's office. Dr. Lin wrote him another oxycodone prescription on September 15, 2011.

On September 24, 2011, Butler was involved in an accident on a cruise ship. A guest/crew accident report, which does not identify the cruise line or the location of the ship, indicates that Butler was hit by a flying plate during a plate-spinning show at dinner. Butler complained of neck stiffness and pain and was told to ice his neck and continue taking his pain medications. Dr. Lin mentions this incident in his October 10, 2011 notes, which say Butler was on a Caribbean cruise. He noted that Butler was short on oxycodone pills because he had been taking extra pills since the accident.

C.     **Assessment by the Social Security Administration**

1.     **Internal Medicine Consultative Report of Dr. Barbara Akresh**

On July 15, 2010, Dr. Barbara Akresh wrote an internal medicine consultative report of Butler. She summarized his work and accident history, noting that he had taken early retirement. She said he had received relief from epidural injections and aqua therapy, but had not had surgery after two surgeons told him they could not guarantee success. She said that since the accident in the cherry picker, Butler had experienced pain in the neck and left shoulder, and that

his back pain radiated down to the back of both legs, primarily the right. He also experienced pain in his left big toe. He told her he needed to change position frequently because he got stabbing pains if he sat for more than 20 minutes, stood for more than 15 minutes, or bent or lifted anything. She noted he was "taking large doses of narcotic pain medication and follow[ing] up with a pain management doctor every two weeks." R. at 394.

Under activities of daily living, Dr. Akresh wrote that Butler's wife did all of his cooking, cleaning, and laundry. He helped with shopping, but said he could not stand more than 10 or 15 minutes, or bend or lift, due to the pain in his back, and that he had trouble putting on his socks. He regularly watched television and listened to the radio. A "Dr. Okeri" was listed as his primary physician, though no records from that doctor appear in the record.

Under physical examination, Dr. Akresh wrote that Butler had a normal gait and appeared in no acute distress, though he was unable to walk on his heels and toes, and could only squat one quarter of the way down while holding onto the examination table. Otherwise, his general appearance, gait and station were normal. Butler complained of movement when moving his head to the left. He could only extend his neck 30 degrees, but exhibited no other problems. In his lumbar spine, Butler showed some tenderness in the middle at L3 and had diminished range of motion. He also had diminished range of motion in his shoulders, elbows, forearms, and wrists bilaterally, and his hips and knees secondary to body habitus, or his body shape, without pain. He had no other apparent musculoskeletal problems. Neurologically, he had diminished sensation to light touches and pinpricks along his entire left leg, but had full strength and equal deep tendon reflexes in his upper and lower extremities. He had no other specific problems.

Dr. Akresh diagnosed Butler with hypertension, history of job injury, history of chronic lower back pain, obesity, and having a status post open cholecystectomy (gallbladder removal).

She gave him a fair prognosis. For her medical source statement, Dr. Akresh said Butler had moderate limitations in his ability to: lift and carry heavy objects; stand for long periods of time due to his chronic low back pain with radiculopathy; and do strenuous activities due to his hypertension. She recommended obtaining more information from his records and tests, and that he not be allowed to operate heavy machinery due to his large doses of narcotic painkillers.

### 2.    Physical RFC Assessment by D. Oreifej

On September 2, 2010, D. Oreifej of the SSA wrote that the SSA had determined Butler disabled under Medical Vocational Rule 201.14. On November 9, 2010, Oreifej completed a physical RFC assessment for the SSA, drawn from the records and possibly by an examination that appears to have been conducted by K. Testa on that same day. That report notes that it is using vocational rule 202.13 as a framework. Oreifej's RFC determination found that Butler had a primary diagnosis of degenerative disc disease, and a secondary diagnosis of obesity. Oreifej assessed Butler with the following exertional limitations: he could occasionally lift or carry 50 pounds; frequently lift of carry 25 pounds; stand or walk about six hours, with breaks, in an eight-hour work day; and that he could push or pull as much as he could lift or carry. Oreifej noted the records from Drs. Akresh and Groves and BRMC. Oreifej found Butler's postural limitations meant he could only occasionally stoop and crouch.

### 3.    Case Analysis by Dr. Edward Wilson

On September 27, 2010, Dr. Edward Wilson, an orthopedist, completed a case analysis for the SSA. Dr. Wilson noted Butler's previous RFC determination, but noted that his limitation on feeling was "not supported" by the evidence in the record. R. at 400. He noted that there was also no evidence in the record to support Butler's assertion that he had been receiving biweekly treatment at a pain clinic, and that there were no clinical findings accompanying his reports of

epidural injections. He also noted that Butler's July 15, 2010 examination, which was conducted by Dr. Akresh, indicated that Butler was generally well. Dr. Wilson's recommendation was that there was insufficient evidence to support a six-hour limitation on standing and walking that would last at least twelve months. He noted that "[t]he earlier evidence from 2003 is too early to have bearing on the present situation since claimant was able to return to w[o]rk after the 2002 episode," and requested that the SSA again seek records from Butler's treating physicians. Id.

### 4.   Hearing on March 27, 2012

Butler appeared before ALJ Lebron on March 27, 2012, with Gelman as his counsel. The ALJ referred to a prior hearing, in October 2011, which is not in the record. At that meeting, he said, they discussed additional records, including earnings certifications from Verizon and the records of Bergen Pain Management and Hudson Heart Associates. He indicated his willingness to sign subpoenas for outstanding records and that many of the documents in the record pre-dated the alleged date of disability.

Butler testified that he had completed high school and between one and two years of college, as well as training as an emergency medical paramedic. Butler summarized his work history as an outside plant technician, or lineman, at Verizon, and Gelman explained that Butler returned to work on April l4, 2009, following the July 10, 2008 injury, for six weeks at half duty before retiring, and that that constituted an unsuccessful work attempt. Butler said that the money he earned in 2010 came from a buyout he took from Verizon, which constituted one or two years' pay paid out half up front and half in monthly payments over four years. Butler said he had injured his lower back, neck and legs, creating cramps, a pins and needles sensation, and a sharp pain that ran constantly down the backs of both legs, most prominently on his right side, and into his right big toe. Before his injury, Butler worked digging holes and installing telephone

poles, digging trenches for buried service lines, pulling cables in manholes, and installing and removing aerial cables for about 30 years. Butler said he had not had any other employment, even part-time, since June 2009, either on or off the books.

Describing his symptoms, Butler testified that it took him nearly an hour each day to get out of bed. He said he would find himself frozen while sitting or lying down until unbearably painful cramps made him jump. He said his back, legs, neck, and left shoulder were hurting him during the hearing. Butler said that he underwent physical and aqua therapy and received epidural shots before June 2009, and that afterward he continued receiving shots and other treatment from a pain management center. He told the ALJ that he stopped the other treatments in 2009, because his providers had told him he had reached maximum medical improvement and that further therapy would not help him. He said he decided to forego surgery since July 2008 because there was no guarantee it would improve his condition and there was a risk that it would worsen it. The ALJ asked him several questions about his "extensive" medical records. R. at 60.

Butler said that he had lost weight since he was diagnosed with morbid obesity, and that although he had put some if it back on, he did not feel his weight significantly impaired his ability to carry on his activities of daily living. The ALJ compared Butler to the comedian Jackie Gleason, who "was considerably overweight, but [who] move[d] around very lightly." R. at 62. Butler said that even when he was at his heaviest, 450 pounds, he was able to fulfill all of his duties at Verizon without issue. Butler told the ALJ that since 2008, he had received prescriptions for oxycodone, Crestor, Azor, Bystolic, and a variety of beta blockers and other blood pressure medications, as well as anti-inflammatories and antibiotics.

Regarding oxycodone, Butler testified that he had built up a tolerance due to his weight and long-term use, which was why he was taking the high doses that drew the attention of

Medco. He said his doctors reduced his dosage after he lost weight, and that he sought help at The Treatment Center in Florida. The ALJ asked him why he referred to the Center "with that disdain," and Butler said that he felt that "there was no need for me to go to Florida for a detox center," and that the Center had promised that they did pain management but offered only detox. R. at 67. Six hours after stopping oxycodone, he said, he went to intensive care because of the pain, and a doctor in the emergency room told him that stopping suddenly would kill him. Days later, he said he discovered that they had been giving him a lower dose of hydrocodone. The Center, he said, referred him to Dr. Lin at the urging of his insurance company. Butler testified that at the time of the hearing, he was taking two 30 mg tablets of oxycodone every four hours.

Butler said that his condition limited his ability to walk, and that he could only go for 10 to 15 minutes before needing a rest. He could not stand for more than 10 minutes and could not bend or squat.  His left hand was weak because of the pain in his shoulder. He could lift no more than ten pounds without undue exertion, and he said he needed to stand after about ten minutes. He proceeded to stand during the hearing because he said he was in discomfort.

The ALJ asked about psychological treatment. Gelman said Butler had been evaluated but never treated for psychological issues. Butler testified that he had trouble sleeping, and woke up hourly due to pain. He described a four-day bout of insomnia, and that he sometimes fell asleep while sitting up. Generally, he slept about three hours a night, with no more than an hour and a half uninterrupted.

Under questioning by his attorney, Butler said he felt a burning, cramping, clicking feeling in his left shoulder that went from his neck down his arm. In his neck, he said he felt a severe pain that radiated through his hip and down his legs. He also said that he felt pins, needles, tingling and cramps in his legs and feet, and that standing, walking, sitting and lying

down made those sensations worse. Butler also said he had chest pains from "even [] the slightest bit of stress." R. at 76. He also experienced pain when he was idle, but nitro patches and nitroglycerin pills helped him.

Butler testified that he had a poor energy level and felt tired and unable to do things because of his pain. He said he also had shortness of breath. To address this issue, he put a Jacuzzi bathtub in his house on the advice of doctors, which he used daily, with limited success. He also exercised at his home, used a TENS (Transcutaneous Electrical Nerve Stimulation) unit, and took hot showers and baths. Butler further testified that he needed a large vehicle because he had trouble entering and exiting smaller ones, and that he was unable to do housework, shovel snow, work on his home, cook, shop, and clean, although he sometimes helped with shopping. His church attendance had dropped from three times a month to once every four to six months. Butler attributed all of this to the July 10, 2008 accident. Asked about his wife's family, he said he had attempted to visit them in Ukraine to be part of his sister-in-law's wedding, but had to cancel his trip because he was unable to sit on a plane for so long.

Regarding the July 10, 2008 accident itself, Butler said it was the fault of a younger worker he was supervising, who drove the truck after Butler said he was going up in a cherry picker bucket. The movement of the truck rammed Butler between a cable and a pole.

### 5.    Letters to the ALJ

Attorney Gelman wrote several letters to the ALJ on Butler's behalf. He sent the first brief on October 11, 2011, noting that the SSA never received the records of Butler's long-term family care doctor, Dr. Henry Okere, or from Dr. Lin, BPA, HHA, the Center or Dr. Sawhney, all of whose records he was in the process of obtaining. He wrote again on October 26, 2011, to

say he was still awaiting the records of Dr. Lin, BPA, and the Center. He sent records from Verizon on November 28, 2011.

On March 23, 2011, Gelman's letter refers to an October 11, 2011 hearing before the SSA, a transcript of which is not in the record. In the letter, Gelman summarized Butler's work history and described Dr. Akresh's report, and noted that the only opinion to support that Butler had the ability to work was the SSA's RFC determination, which was not from a doctor. Dr. Akresh's report, he said, was supported by the records of Dr. Lin, BPA and the Center, including the Center's evaluation of Butler's GAF. Gelman also argued that Butler's workers' compensation settlements had only "historical value." R. at 314.

### 6.    The ALJ's Determination

The ALJ issued an unfavorable decision to Butler on August 31, 2012. The ALJ determined that Butler was not disabled under § 216(i) or § 223(d) of the Act.

At step one, the ALJ found that Butler met the Act's insurance requirements through December 31, 2014, and that Butler had not engaged in any substantial gainful activity ("SGA") since the alleged onset date of July 10, 2008. He noted that Butler's brief work in April 2009 was an unsuccessful work attempt, and that the income he received from Verizon since mid-2009 came from a severance package rather than any performed work. At step two, the ALJ found that Butler suffered from four severe impairments: obesity, hypertension, degenerative disc disease of the lumbar spine, and opioid dependence.

At step three, the ALJ found that Butler's severe impairments did not meet or medically equal any of the impairments contained in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"). For Butler's degenerative disc disease, the ALJ specifically noted that a July 27, 2008 MRI of Butler's lumbar spine and physical examinations revealed only diminished

sensation in a nondermatomal distribution, rather than in a neuro-anatomical distribution, as the

Listings require, nor did it indicate any evidence of spinal arachnoiditis (inflammation) or

pseudoclaudication (painful cramps), as required by Parts B and C, respectively. For Butler's

hypertension, the ALJ noted that no listing specifically applied, and that Butler's claim did not

meet Section 4.00 of the Listings, as the record had not demonstrated any evidence of end organ

damage beyond complaints of non-exertional chest pain and shortness of breath, and that a

cardiac work-up did not show ischemia or another significant abnormality. For Butler's opioid

dependence, the ALJ wrote that neither Listing 12.09 nor any of the Listings in Section 4.00

applied. For Butler's obesity, the ALJ found that it met no listed impairment but did affect his

evaluation of Butler's RFC.

Before continuing to step 4, the ALJ analyzed Butler's RCF, which evaluates a

claimant's exertional limitations. He found that Butler had the capacity to perform light work

that was "limited to simple, unskilled work tasks" that were performed without exposure to

unprotected heights, dangerous machinery, or any other hazards, and that did not give him access

to either narcotic medications or other controlled substances. R. at 26.

The ALJ found that while Butler's "medically determinate impairments could reasonably

be expected to cause the alleged symptoms . . . [his] statements concerning the intensity,

persistence and limited effects of these symptoms are not credible to the extent that they are

inconsistent with the above [RFC] assessment." R. at 27. He then went on to examine the

medical evidence. He noted that the report of Dr. Spinapolice did show that Butler had received

oxycodone and three epidural steroid injections from BPA since 2001, but did not include any

findings from a physical examination. Further, the ALJ noted that the Bergen records

demonstrated Butler's "changing responsibilities during the upcoming summer" in a letter

26

written on September 9, 2009, and that Butler had mentioned traveling out-of-state for a job

interview. Id. The ALJ wrote that Butler first saw Dr. Lin in 2011, and that a physical

examination showed that Butler was morbidly obese. The ALJ found no indication that Dr. Lin

had considered any treatment other than oxycodone. The ALJ noted that Dr. Lin's report

conflicted with the alleged onset date of Butler's disability. On April 25, 2011, and May 5, 2011,

Butler told Dr. Lin that he was experiencing increased pain due to increasing demands at work,

and that on June 9, 2011, Dr. Lin had written that Butler "had been in London for a few weeks

for work." R. at 28. The ALJ found that Dr. Akresh's July 15, 2010 consultative examination of

Butler showed that Butler was moderately limited in his ability to lift and to carry heavy objects,

to stand for long periods because of his lower back pain, and to engage in strenuous activity

because of his history of hypertension, and that Butler should not be allowed to operate heavy

machinery because he was taking large doses of narcotic medication. The ALJ noted that Dr.

Kulkarni's March 8, 2011 independent examination for Workers' Compensation benefits

assessed Butler as experiencing a 25-percent "loss of use," but also that it gave no specifics

regarding any functional limitations on Butler. Id.

     Reviewing the evidence of Butler's opioid dependence, the ALJ found that Dr. Sawhney

confirmed that Butler had been using oxycodone for over 20 years following an earlier motor

vehicle accident. The ALJ noted that Butler was admitted for treatment for oxycodone abuse on

March 28, 2011 and was discharged on April 8, 2011, but that he admitted two days later that he

had resumed taking oxycodone. Butler refused treatment with non-narcotic medications and left

when his demands for oxycodone or another narcotic were refused, and Dr. Sawhney then

referred Butler to a methadone treatment program, which Butler seemingly did not attend. For

Butler's shortness of breath and occasional non-exertional chest pain, the ALJ noted that a stress

test was normal and showed no ischemia, and that nitroglycerin patches had relieved Butler's complaints.

Looking at all the evidence, the ALJ found that Butler was "not entirely credible." R. at 29. He noted that Butler's complaints of trouble from lower back pain and an inability to stand for long periods were contradicted by evidence in the record, particularly a June 9, 2009 letter Butler wrote to Dr. Spinapolice "in which he indicated that he would be assisting with the care of his wheelchair[-]bound mother for several months while her nursing assistant was away. Additionally, upon initiating his course of treatment with Dr. Lin, the claimant listed his current hobbies as including diving and flying, and he reported on several dates that he was currently working." Id. (citations omitted). The ALJ also noted that Butler had relied exclusively on treatment with oxycodone, despite being urged to seek alternate treatment by his own physician and his inpatient treatment for narcotic dependence. The ALJ noted that Butler's attorney argued that Butler's high doses of oxycodone indicated a serious disability, but found that "the claimant's continued use of high dose oxycodone can be more accurately attributed to his opioid dependence than to his inability to adequately control his pain through any other treatment method." R. at 29-30.

The ALJ based his findings on the reports of Drs. Akresh, Kulkarni, and Sawhney, though to varying degrees. The ALJ summarized Dr. Akresh's report and assigned it the "greatest weight, with the exception of her finding that the claimant is moderately limited in standing for prolonged periods." R. at 30. The ALJ found that Dr. Akresh based most of her findings on her own evaluation of Butler, but that her finding regarding standing was not consistent with other evidence in the record. As for Dr. Kulkarni's report, the ALJ noted that it gave no information about the extent of Butler's functional limitations and was not entitled to

special significance under the Act because it was prepared for use by a Workers' Compensation Board. Finally, examining Dr. Sawhney's statement, the ALJ found that it was "not entitled to controlling weight because it is not well supported by medically acceptable clinical and laboratory diagnostic techniques, nor is it consistent with other opinions in the record." Id. (citation omitted). The ALJ found that Dr. Sawhney "failed to offer any objective clinical findings in support of his conclusions" because Butler's nuclear stress test, on which Dr. Sawhney relied, was normal. R. at 31. The ALJ found that Dr. Sawhney had therefore relied exclusively on Butler's subjective complaints, and he accordingly afforded the opinion only slight weight.

At step four, the ALJ found that Butler was unable to perform any of his past relevant work due to his restriction to simple, unskilled work. He noted that the transferability of Butler's job skills was immaterial because Butler was not disabled, and that there were a significant number of jobs in the national economy that fit Butler's profile. The ALJ did not, however, invoke the opinion of a vocational expert or name any specific jobs.

Represented by a new attorney, Gabriel Jacob Hermann, Butler filed a brief to the SSA appealing the ALJ's decision on December 17, 2012.

## DISCUSSION

## I.     Standard of Review

A party may move for judgment on the pleadings "[a]fter the pleadings are closed – but early enough not to delay trial." Fed. R. Civ. P. 12(c). A Rule 12(c) motion should be granted "if, from the pleadings, the moving party is entitled to judgment as a matter of law." Burns Int'l Sec. Servs., Inc. v. Int'l Union, United Plant Guard Workers of Am. (UPGWA) & Its Local 537, 47 F.3d 14, 16 (2d Cir. 1995) (per curiam). In reviewing a decision of the Commissioner, a court

may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

A determination of the ALJ may be set aside only if it is based upon legal error or is not supported by substantial evidence. Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). If the findings of the Commissioner as to any fact are supported by substantial evidence, those findings are conclusive. Diaz v. Shalala, 59 F.3d 307, 312 (2d Cir. 1995). See also Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."). This means that if there is sufficient evidence to support the final decision, the Court must grant judgment in favor of the Commissioner, even if there also is substantial evidence for the plaintiff's position. See Brault v. Soc. Sec'y Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (finding that "[t]he substantial evidence standard means once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would *have to conclude otherwise*" (internal citation and quotation marks omitted; emphasis in original)).

Though generally entitled to deference, an ALJ's disability determination must be reversed or remanded if it is not supported by "substantial evidence" or contains legal error. See Rosa, 168 F.3d at 77. Thus, "in order to accommodate 'limited and meaningful' review by a district court, the ALJ must clearly state the legal rules he applies and the weight he accords the evidence considered." Rivera v. Astrue, 10 Civ. 4324 (RJD), 2012 WL 3614323, at *8 (E.D.N.Y.

August 21, 2012) (citing <u>Reyzina v. Apfel</u>, 98 Civ. 1288 (JG), 1999 WL 65995, at *13 (E.D.N.Y. February 10, 1999)). Without doing so, the ALJ deprives the Court of the ability to determine accurately whether his opinion is supported by substantial evidence and free of legal error. Where the ALJ fails to provide an adequate roadmap for his reasoning, remand is appropriate. <u>Ferraris v. Heckler</u>, 728 F.2d 582, 587 (2d Cir. 1984) ("[W]e do believe that the crucial factors in any determination must be set forth with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.").

## II.     Definition of Disability

A claimant is disabled under the Act if he demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A determinable physical or mental impairment is defined as one that "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). A claimant will be determined to be disabled only if the impairments are "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A).

Under the authority of the Act, the SSA has established a five-step sequential evaluation process when making disability determinations. <u>See</u> 20 C.F.R. § 404.1520. The steps are followed in order: if it is determined that the claimant is not disabled at a step of the evaluation

process, the evaluation will not progress to the next step. The Court of Appeals has described the

process as follows:

> First, the Commissioner considers whether the claimant is currently
> engaged in substantial gainful activity. Where the claimant is not,
> the Commissioner next considers whether the claimant has a "severe
> impairment" that significantly limits her physical or mental ability
> to do basic work activities. If the claimant suffers such an
> impairment, the third inquiry is whether, based solely on medical
> evidence, the claimant has an impairment that is listed in 20 C.F.R.
> Pt. 404, subpt. P, app. 1 . . . . Assuming the claimant does not have
> a listed impairment, the fourth inquiry is whether, despite the
> claimant's severe impairment, she has the residual functional
> capacity to perform her past work. Finally, if the claimant is unable
> to perform her past work, the burden then shifts to the Commissioner
> to determine whether there is other work which the claimant could
> perform.

Jasinski v. Barnhart, 341 F.3d 182, 183-84 (2d Cir. 2003) (citation omitted). A claimant bears the

burden of proof as to the first four steps. Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999). It is

only after the claimant proves that she cannot return to prior work that the burden shifts to the

Commissioner to show, at step five, that other work exists in the national and local economies

that the claimant can perform, given her RFC, age, education, and past relevant work experience.

20 C.F.R. § 404.1560(c)(2); Melville, 198 F.3d at 51.

## III.   Analysis

On appeal to this Court, Butler principally argues that the ALJ improperly assessed

Butler's credibility and that substantial evidence does not support the ALJ's RFC determination.

In addition, Butler argues that the ALJ failed to consider all of Butler's impairments and that

there exist additional legal errors in the ALJ's decision. On review, the Court finds that the

ALJ's decision was free of legal error and supported by substantial evidence.

A.      The ALJ's Determination of Butler's Credibility

It is the ALJ's role to evaluate a claimant's credibility and to decide whether to discredit a claimant's subjective estimate of the degree of his impairment. Tejada v. Apfel, 167 F.3d 770, 775-76 (2d Cir. 1999). See also 20 C.F.R. § 416.929(b) (dictating than an individual's subjective complaints alone do not constitute conclusive evidence of a disability). In making a credibility determination, if a claimant alleges symptoms of greater severity than established by the objective medical findings, the ALJ should "consider all available evidence," including the claimant's daily activities, the location, nature, extent, and duration of his symptoms, precipitating and aggravating factors, the type, dosage, effectiveness and side effects of medications taken, and other treatment undertaken to relieve symptoms. Cichocki v. Astrue, 534 F. App'x 71, 75-76 (2d Cir. 2013) ("Cichocki I") (citing 20 C.F.R. § 416.929(c)(2)); 20 C.F.R. §§ 404.1529(c)(3)(i)-(vi), 416.929(c)(3)(i)-(vi). SSA regulations provide that the ALJ must assess a claimant's credibility before evaluating his RFC, not the other way around. See Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. §§ 404.1529(a)-(b), 404.1512(b)(3); SSR 96-7p, 1996 WL 374186 (July 2, 1996)); Cruz v. Colvin, 12 Civ. 7346 (PAC)(AJP), 2013 WL 3333040, at *16 (S.D.N.Y. July 2, 2013) (collecting cases).

The ALJ wrote that Butler's statements in testimony were "not credible to the extent they [were] inconsistent with the above residual functional capacity assessment." R at 27. Use of this boilerplate language is error. Credibility is to be measured against objective medical evidence, not against the ALJ's own assessment of a claimant's capacity. See also Cruz, 2013 WL 3333040, at *15-16 (holding that the ALJ must determine the claimant's credibility in light of the objective record evidence). Remand, however, is not necessary for two reasons: (1) the ALJ went on to make specific credibility findings based on the record before making his RFC

determination; and (2) the Court has independently compared Butler's statements about the intensity, persistence, or limiting effects of his impairment to the objective medical and other evidence in the record and finds that the ALJ's credibility finding is supported by substantial evidence.

Despite the ALJ's boilerplate language, later portions of the ALJ's decision indicate that the ALJ did consider Butler's credibility vis-à-vis all of the medical evidence in the record and did credit some of his testimony, as instructed by the guidelines. See Cichocki I, 534 F. App'x at 75-76. For instance, the ALJ noted that Butler told Dr. Lin that his duties at work were causing him pain, even though he told the SSA he was not working at that point. He also told Dr. Lin that he had traveled internationally but had been managing his pain well with his medication. The ALJ also noted that tests at HHA, although they showed some minor atypical results, failed to show any significant abnormalities or evidence of ischemia. The ALJ specifically said that, in light of "the entire medical record," Butler's statements were "not entirely credible." R. at 29. The ALJ highlighted contradictions in Butler's record, such as his claim that he was able to handle self-care but unable to do household chores, and that he suffered from disabling back pain but had indicated to his physicians that he cared for his wheelchair-bound mother for several months, continued to work, and enjoyed hobbies such as diving and flying. The ALJ also noted that Butler appeared to have relied on oxycodone to the exclusion of all other treatment, despite the urging of his physicians and his inpatient treatment for opioid dependence.

Butler's attempts to limit the impact of these contradictions by citing the lack of external evidence of work after July 2008, and the idea that "medical records can certainly contain mistakes," Pl's. Br. at 8, do not overcome the substantial evidence that supports the ALJ's determination. This is particularly true when, as here, Butler does not deny that he continued to

work or that he traveled far distances that required sitting for long periods of time.[9] And while the ALJ did not affirmatively find that Butler had worked at SGA levels after the date of his alleged injury, the ALJ could reasonably have found, on the basis of substantial evidence, that Butler had engaged in enough work to undermine his credibility.

Although the ALJ accepted Butler's "allegations of chronic lower back pain," he said he did not accept that the pain alone was a basis for a finding of disability, given that Butler refused all non-narcotic treatment. R. at 29. The ALJ reasonably attributed Butler's continued use of oxycodone to opioid dependence rather than "his inability to adequately control his pain through any other treatment method." R. at 30. When a claimant alleges disabling pain but refuses physicians' attempts to remediate it, the alleged impairment is considered "not disabling." Dumas v. Schweiker, 712 F.2d 1545, 1553 (2d Cir. 1983). It was only after the credibility determination that the ALJ evaluated Butler's RFC. "Taken as a whole, [Butler]'s testimony did not preclude the possibility that []he could perform gainful activity of a light[] nature." Rivera v. Harris, 623 F.2d 212, 216 (2d Cir. 1980) (allowing ALJ to look to claimant's testimony and reports of physicians to determine RFC).

### B.      Substantial Evidence Supports the ALJ's RFC Determination

An RFC determination indicates "the most [a claimant] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1). To determine a claimant's RFC, the ALJ "identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 C.F.R. [§§] 404.1545 and 416.945." Cichocki v. Astrue, 729 F.3d 172, 176 (2d Cir. 2013) ("Cichocki II") (per curiam) (quoting SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996)). These

---

[9] The plaintiff concedes "that the statements in the record regarding Butler's work activity are an issue that impact on his credibility." Pl's. Reply at 1.

functions "include physical abilities such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions; mental abilities such as understanding, remembering, carrying out instructions, and responding appropriately to supervision; and other abilities that may be affected by impairments, such as seeing, hearing, and the ability to tolerate environmental factors." Id. at 176 (citations omitted).

Substantial evidence supports the ALJ's RFC determination. The ALJ adopted Dr. Akresh's conclusions that Butler was moderately limited in his ability to lift and carry heavy objects, to stand for long periods, and to engage in strenuous activity, and that he should avoid taking large doses of narcotic pain medications. He did not, however, adopt her finding that Butler was moderately limited in his ability to stand for prolonged periods of time due to the factors outlined above. The ALJ properly applied the treating physician rule in giving less weight to Dr. Sawhney's Cardiac Medical Source Statement, which the ALJ reasonably concluded was contradicted by multiple laboratory tests and other opinions in the record. He also correctly noted that Dr. Sawhney's statement "failed to offer any objective clinical findings in support of his conclusions," instead referring to a test which was within normal limits, and so the ALJ had substantial evidence to support his determination that Dr. Sawhney was relying primarily on Butler's subjective complains. R. at 31.

Dr. Akresh's consultative opinion, along with the notes of all of the other physicians and test results in the record, provided the ALJ with sufficient information to make the RFC determination, and they are valid sources of evidence to overcome the contradictory opinion of a treating physician. "It is an accepted principle that the opinion of a treating physician is not binding if it is contradicted by substantial evidence, Parker v. Harris, 626 F.2d 225, [(2d Cir. 1980),] and the report of a consultative physician may constitute such evidence. Miles v. Harris,

36

645 F.2d [122,] 124 [(2d Cir. 1981)]; Perez v. Secretary of HEW, 622 F.2d 1 (1st Cir. 1980)."

Mongeur v. Heckler, 722 F.2d 1033, 1039 (2d Cir. 1983) (per curiam).

The ALJ's determination also was not vague, as Butler contends. The use of the term

"moderate" to describe Butler's limitations is not itself grounds for remand when other evidence

supports the determination. See Rosenbauer v. Astrue, 2014 U.S. Dist. LEXIS 117519, 41-44

(W.D.N.Y. Aug. 22, 2014) (collecting cases and concluding that an opinion using the phrase

"moderately limited" was adequate as a basis for the ALJ's opinion). See also Diaz, 59 F.3d at

315 (an ALJ may look at various sources, including the opinions of examining physicians, the

plaintiff's testimony, and the plaintiff's tests, for substantial evidence). Butler's attempt to

redefine Dr. Akresh's terminology *ex post facto* is unavailing.

The ALJ also properly evaluated Butler's disability claim using the Grids[10] as a

framework, rather than relying on a vocational expert, in finding that he was not disabled due to

his age, education, work experience and ability to perform light work. "Light work" involves

lifting a maximum of 20 pounds frequently or carrying objects of no more than 10 pounds, as

well as walking and standing, and generally includes sedentary work. See 20 C.F.R. § 404.1567;

SSR 83-10, 1983 WL 31251 (January 1, 1983). Under Social Security Ruling 83-10, this was a

permissible use of the SSA's administrative notice of the availability of light work in the national

economy. SSR 83-10 at *4. When a claimant, such as Butler, suffers from both exertional and

nonexertional limitations (such as a complaint of pain), and the evidence does not indicate a

strength limitation, which is the case here, the Grids "provide a framework to guide [the SSA's]

---

[10] "In the ordinary case, the Commissioner meets his burden at the fifth step by resorting to the applicable [M]edical [V]ocational [G]uidelines." Rosa, 168 F.3d at 78 (citation and internal quotation marks omitted). Those guidelines, colloquially known as "the Grids," take into account "the claimant's residual functional capacity in conjunction with the claimant's age, education, and skill level." Id. (citation and internal quotation marks omitted).

decision." 20 C.F.R. § 404.1569a(d). Under the Grids, which properly guided the ALJ's decision, someone of Butler's age, education and work experience who is capable of performing light work is considered "not disabled." 20 C.F.R. Part 404, Subpart P, App'x 2, Grid Rules 202.13-202.15, 202.20-202.22.

The ALJ concluded that Butler had two non-exertional limitations: his need to avoid unprotected heights, dangerous machinery and other hazards, and his need to avoid access to narcotic medications. The ALJ said that these restrictions "[did] not significantly reduce the occupational base of unskilled exertionally light occupations contemplated by the Medical-Vocational Guidelines." R. at 32. Butler's nonexertional limitations are among those "which have very little or no effect on the unskilled light occupational base," SSR 83-14, 1983 WL 31254, because, as the ALJ correctly noted, they "do[] not significantly reduce the occupational base of unskilled exertionally light occupations contemplated by the Medical-Vocational Guidelines." R. at 32. See also SSR 85-15, 1985 WL 56857, at *8 (January 1, 1985) (restrictions against height and dangerous machinery are "an example of someone whose environmental restriction does not have a significant effect on work that exists at all exertional levels."). An ALJ is not required to use a vocational expert for obvious cases, even if it is advised. 20 C.F.R. § 404.1569a(b); SSR 85-15 at *3.

**C.      Duty to Complete the Record**

Butler claims that the ALJ failed in his duty to develop the administrative record by relying on the opinion of Dr. Akresh. To the extent that this is a claim that the ALJ did not properly evaluate Butler's RFC, it is assessed above. While it is true that a case may be remanded where a record is seriously underdeveloped, that is not the case here. See, e.g., Rosa, 168 F.3d at 79-80 (holding that the ALJ failed to fully develop the record by neglecting to seek

information or explanation to supplement treating physician's "sparse" notes which were
"conclusive of very little").

Here, Butler's record contains 658 pages of notes from a wide variety of doctors, with
documents spanning as far back as 2005 and up to and including 2012. The notes cover treatment
well before, during, and after the date of alleged disability, from numerous sources. Though not
every doctor is represented—Butler's general physician, Dr. Okere, has no notes in the record—
the record shows that the ALJ gave Butler every opportunity to subpoena relevant records and
time to receive them. Butler's letters to the ALJ first indicated that his attorney was awaiting Dr.
Okere's records, but later only said that he was awaiting other doctors' records. Faced with the
records of many different physicians and no objections from the plaintiff or his counsel, the
ALJ's duty was fulfilled, and did not obligate him to seek a doctor's opinion on every minute
contradiction in the record. The ALJ is entitled to review treatment notes along with opinion
reports and to draw his own conclusion. 20 C.F.R. § 404.1513(a)(1) (including licensed
physicians as acceptable medical sources).

## CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings is
GRANTED, and the plaintiff's cross-motion for judgment on the pleadings is DENIED. The
Clerk of Court is directed to terminate the motions at Docket Entry Nos. 16 and 18.

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge


DATED:        New York, New York
              June 8, 2015